NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 7

No. 2016-303

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Criminal Division |
| | |
| John Discola | October Term, 2017 |

A. Gregory Rainville, J.

Sarah George, Chittenden County State's Attorney, and Pamela Hall Johnson, Burlington, and
  David Tartter, Montpelier, Deputy State's Attorneys, for Plaintiff-Appellee.

Allison N. Fulcher of Martin & Associates, Barre, for Defendant-Appellant.

PRESENT:  Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1.     **ROBINSON, J.**   Defendant John Discola appeals his conviction of one count of lewd and lascivious conduct, 13 V.S.A. § 2601, and two counts of lewd or lascivious conduct with a child, 13 V.S.A. § 2602.  Defendant asserts that: (1) the evidence was insufficient to demonstrate that he had engaged in lewd and lascivious conduct or that he had engaged in such conduct with a child with sexual intent; (2) the witnesses' pretrial identifications of defendant were suggestive and prejudicial; and (3) the State's prejudicial closing remarks altered the trial outcome.  We affirm.

¶ 2.     The State presented the following evidence during the jury trial below.  M.G., the mother of one of the alleged victims, G.G., testified that on May 24, 2015, she had taken G.G.— who was then fifteen-years-old—to Burlington to participate in the city marathon.  The two were

waiting in Burlington's Battery Park for the race to start when M.G. noticed that G.G. was upset. G.G. explained that she wanted to move because a man had "touched" her. G.G. pointed to the man, whom M.G. described at trial as tall, thin, dirty, with hair to his shoulders, untrimmed facial hair, wearing a backpack, and with tattoos on his right arm. The man looked back at M.G. and smiled "like he knew we were upset and talking about what had happened." She called the Burlington Police Department the next day to report the incident.

¶ 3. G.G. testified regarding the specific circumstances of this touching. She stated that she felt someone brush up against her and around her buttocks. Approximately two minutes later, it happened again, this time a "stronger brush," which felt like "a hand on . . . [her] butt." She turned around and saw a man she described at trial as tall, with long brown hair, an untrimmed dirty beard, and wearing a backpack. Moments later, G.G. felt a hand on her buttocks once more. This time the touch was "firmer." When she glanced back, G.G. saw the same tall man standing behind her staring with a "smug" expression. It was at this point that G.G. asked her mom if they could move.

¶ 4. On the same morning, fourteen-year-old A.T. was in Burlington's Waterfront Park to watch the end of the marathon with her mother and sister, sixteen-year-old G.T. A.T. testified that while meeting her sister in the park she "felt something brush up against [her] butt." A.T. looked behind her and saw a tall, thin man with long hair and a long beard holding a water bottle. She didn't think much of this incident because of the crowd size in the park and she kept walking. After going about five feet, she felt touching on her buttocks again, which to her felt like a water bottle. A.T. walked to the front of the Echo Aquarium at the waterfront, at which point she saw the same man coming towards her. She turned her back to him and soon felt another touch on her buttocks. A.T. recounted that it felt like a finger rubbing across her buttocks. When A.T. turned around, the man was smiling at her. She then told her mother about this incident, and by that time,

the man had walked up the hill and out of the park. A.T. made a report to the Burlington Police Department a few days later.

¶ 5. Detective Matthew Sweitzer of the Vermont State Police was on marathon detail in Waterfront Park when he noticed a man, later identified as defendant, walking near a group of teenage girls. Detective Sweitzer determined that defendant was not connected to the group because he was not engaging in their conversation or interacting with them in any other way. Detective Sweitzer was alarmed by defendant's close proximity to this group. He noticed that defendant tried to stay right behind the girls as they walked and that his hands were in "an odd position." Detective Sweitzer began to follow defendant and finally approached him to ask what he was doing in the park. Defendant answered that he was meeting a friend for burritos. Detective Sweitzer snapped a picture of defendant, later admitted at trial.

¶ 6. Curtis Russell, a race participant, was in Battery Park waiting for his leg of the relay race to start when he noticed a man in the park who seemed out of place with the race participants. This man was wearing a backpack, sweatshirt, and cargo pants and he was staring at people in a way that made Russell suspicious. Russell watched him for approximately five minutes and watched as the man stopped to stare at a woman, positioned himself behind her, and then grabbed her buttocks in a "good grip." The woman acted "surprised" and turned around to see what had happened, but the man had moved away. Russell took a picture of the man, subsequently determined to be defendant.

¶ 7. During a pretrial hearing in November 2015, G.G., A.T., and G.T. each identified defendant in court. On the eve of trial, defendant moved to suppress these pretrial identifications under Chapter I, Article 10 of the Vermont Constitution, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Vermont Rule of Evidence 403 because, he argued, the identifications were suggestive and unreliable. Defendant contended that the pretrial hearing provided the witnesses their first opportunity to identify defendant, as they had not

3

participated in a photo lineup; A.T. and G.T. had seen a picture of defendant in the newspaper right before the hearing; the pretrial identification occurred five months after the alleged event; and the identification occurred in a setting where defendant was in court and seated at defense counsel's table wearing a prison uniform and shackles.

¶ 8. The court denied this motion, holding that while the circumstances surrounding the pretrial identification were suggestive, the identifications bore sufficient indicia of reliability. The court noted that G.G. had testified based on memory; the witnesses provided descriptions of defendant at the hearing that matched descriptions they had given in May—including specific details that would not have been available by looking at the photo; and the witnesses were highly certain in their identifications. During the trial, G.G., A.T., and G.T. again each identified defendant in the courtroom, over the objection of defense counsel.

¶ 9. After the close of the State's evidence at trial, defendant moved for a judgment of acquittal under Vermont Rule of Criminal Procedure 29. Defendant argued that the alleged acts did not amount to lewd and lascivious conduct under 13 V.S.A. § 2601, and that the evidence was insufficient to prove that he grabbed the minor victims with the specific intent to gratify sexual desires required under 13 V.S.A. § 2602.

¶ 10. The court held that whether the alleged acts were lewd and lascivious was a factual matter best left to the jury to determine according to prevailing community standards of decency. The court also held that the evidence supported the charge that defendant accosted the minor victims with intent to gratify sexual desires. After the court denied the motion for acquittal, defendant rested without presenting evidence.

¶ 11. In its closing argument, the State described defendant's argument that the behavior in question was not lewd and lascivious as "sad," and admonished the jury to "send a message" to the girls and women, defendant, and the community that what happened in this case would not be tolerated. Defendant did not object to these statements during the argument.

4

¶ 12.    The jury convicted defendant of one count of lewd and lascivious conduct under § 2601 (relating to his touching the unidentified woman) and two counts of lewd or lascivious conduct with a child under § 2602 (relating to his touching A.T. and G.G.). The court sentenced defendant concurrently to two to five years' incarceration for the lewd and lascivious charge under § 2601, and five to fifteen years for each of the two counts of lewd or lascivious conduct with a child under § 2602.

¶ 13.    On appeal, defendant argues that: (1) his conduct was not lewd and lascivious, and the State failed to prove that he touched the minor victims with lustful intent; (2) the pretrial identifications of defendant by G.G., A.T., and G.T. should have been suppressed because they were suggestive, prejudicial, and unreliable; and (3) the State's prejudicial closing remarks affected the jury deliberations and, ultimately, defendant's constitutional rights. We disagree and affirm.

## I.  Lewd and Lascivious Conduct

¶ 14.    Defendant argues that the trial court should have granted his motion for judgment of acquittal because, even if proven, his conduct was not lewd and lascivious. Essentially, defendant argues that "while the touching may have been done without permission and wrong, it is not criminal" because "[m]ere contact with the clothed buttock under the circumstances presented here was not lustful, gross and wanton indecency in sexual relations." In addition, defendant argues that the State failed to prove that he touched the minor's buttocks with a sexual intent, as is necessary for a conviction under 13 V.S.A. § 2602.

## A.  Preservation

¶ 15.    As an initial matter, because defendant did not present any evidence, we reject the State's contention that even though defendant moved for a judgment of acquittal after the close of the State's evidence, but did not renew the motion at the close of all evidence or within ten days after the jury had returned a verdict, defendant waived his right to challenge the sufficiency of the

5

evidence on appeal. See State v. Noyes, 2015 VT 11, ¶ 41, 198 Vt. 360, 114 A.3d 1156 (explaining that defendant waived claims in motion for judgment of acquittal by failing to renew the motion either at the close of the evidence or within ten days after the jury had rendered its verdict). The State posits that, to preserve his challenge to the sufficiency of the evidence, defendant needed to renew his Rule 29 motion after notifying the court that he was resting his case without presenting evidence—which would have required that defendant renew his motion virtually right after the court had denied it. We disagree.

¶ 16. This Court applies the preservation requirement in Rule 29 with reference to the Rule's purpose. In State v. Johnson, for instance, we examined a situation in which the defendant, who did not present evidence, moved for judgment of acquittal at the charge conference instead of the close of the evidence. 2013 VT 116, ¶ 11, 195 Vt. 498, 90 A.3d 874. The State argued that because the defendant had not moved for judgment of acquittal at the close of the State's case, and instead waited until the charge conference, his claims were not preserved. This Court disagreed and noted:

> Although it is true that defendant did not move for acquittal at the precise moment of the close of evidence, we reject the State's hyper-technical reading of Rule 29. Rather, because defendant did not present witnesses or put on evidence, the timing of his motion—after a short recess following the close of evidence and immediately before the charge conference—did not alter the course of the proceedings in any way.

Id. ¶ 24. In so holding, we explained that Rule 29 "provides for multiple opportunities for acquittal and is thus clearly intended to offer defendants flexibility in challenging the sufficiency of the evidence at trial." Id. ¶ 25

¶ 17. Likewise, here we reject the notion that defendant needed to renew his Rule 29 motion after informing the court that he was resting without presenting evidence. Defendant made his motion at the close of the State's evidence. After the court denied his motion, defendant rested without putting on a case. Thus, the close of the State's evidence was the effective close of all

6

evidence. Requiring that defendant renew his motion after informing the court that he was resting—which, in this case, occurred only moments after the court denied his motion—in order to preserve his claims would have been an "empty ritual."[1] United States v. DeLeon, 247 F.3d 593, 596 n. 1 (5th Cir. 2001)[2] ; see also United States v. Wilson, 240 F.3d 39, 43 (D.C. Cir. 2001) ("Because [defendant] presented no defense at all, his motion [for judgment of acquittal] at the end of the government's case fully preserved his claim."); United States v. Clotida, 892 F.2d 1098, 1103 (1st Cir. 1989) ("It has been uniformly held that if a defendant rests without introducing evidence of [his or her] own [he or she] need not renew [the] Rule 29 motion in order to preserve [the] objection to the sufficiency of the evidence." (quotation omitted)); 2A Wright and Henning, Federal Criminal Practice & Procedure § 463 (4th ed.) (explaining that defendant "is not required to put on evidence, and if [he or she] then rests without introducing evidence [he or she] need not renew [the] motion in order to preserve [his or her] objection to the sufficiency of the evidence").[3]

---

[1] Because we hold that defendant effectively moved for a judgment of acquittal at the close of all evidence, he was not required to take the additional step of renewing his motion within ten days after the jury had returned its verdict. Noyes, 2015 VT 11, ¶ 41.

[2] Federal case law informs our interpretation here because where our state rules—such as Rule 29—are "based on or closely correspond with federal rules, federal interpretations of the rules are instructive." State v. Villar, 2017 VT 109, ¶ 9, __ Vt. __, __ A.3d __.

[3] During oral argument, the State cited to State v. Whittemore, No. 2001-184, 2002 WL 34423632 (Vt. 2002) (unpub. mem.) in support of its argument that, by failing to renew his motion after resting, defendant failed to preserve his Rule 29 claims. In Whittemore, the defendant moved for judgment of acquittal at the close of the State's case, rested without presenting evidence, and did not renew her motion after informing the court that she was resting. This Court explained that the defendant had not preserved her claims because "she failed to renew her motion for acquittal at the close of the evidence or after the jury's verdict within the time prescribed by V.R.Cr.P. 29(c)." Id. at *2.

Whittemore was a three-justice entry-order with no binding precedential effect. V.R.A.P. 33.1 ("An unpublished decision by a three-justice panel may be cited as persuasive authority but is not controlling precedent . . . ."). We find its reasoning unpersuasive. In support of its holding on this issue, Whittemore cited only to State v. Crannell, 170 Vt. 387, 407-08, 750 A.2d 1002 (2000). Crannell unremarkably explains that a defendant must renew a motion for judgment of acquittal "at the close of the evidence" or within ten days after the jury's discharge in order to preserve his or her claims. 170 Vt. at 407, 750 A.2d at 1018-19. Crannell, however, says nothing about whether a defendant must renew his or her motion if he or she rests without presenting

## B. Sufficiency of the Evidence

¶ 18. In determining whether the State presented sufficient evidence that defendant's conduct was lewd and lascivious, and that, with respect to the minor victims, he did so with lustful intent, "we review the evidence presented by the State viewing it in the light most favorable to the prosecution and excluding any modifying evidence and determine whether that evidence sufficiently and fairly supports a finding of guilt beyond a reasonable doubt." State v. Lampman, 2017 VT 114, ¶ 24, __Vt.__, __ A.3d __ (quotation omitted). We examine both the strength and the quality of the evidence; "evidence that gives rise to mere suspicion of guilt or leaves guilt uncertain or dependent upon conjecture is insufficient." Id. (quotation omitted).

### 1. Lewd and Lascivious Behavior

¶ 19. We disagree with defendant's argument that, as a matter of law, the unwanted grabbing of the woman's and minor victims' buttocks did not criminally offend community standards of decency. Evidence of the unwanted nature of this touching, the context in which the touching occurred, and the sexual nature of the buttocks, was enough to leave this case to the jury.

¶ 20. "Lewd and lascivious" behavior for purposes of 13 V.S.A. § 2601 is broadly defined. Vermont's statute concerning lewd and lascivious conduct states that "[a] person guilty of open and gross lewdness and lascivious behavior shall be imprisoned not more than five years or fined not more than $300, or both." 13 V.S.A. § 2601. The statute does not define "open and gross lewdness and lascivious behavior," and this Court has also declined to give this language a precise definition. Rather, we defer to "the common sense of the community," and, in turn, the members of the jury, to define open and gross lewd and lascivious conduct in each particular case. State v. Penn, 2003 VT 110, ¶ 12, 176 Vt. 565, 845 A.2d 313 (mem.); see also State v. Ovitt, 148 Vt. 398, 405, 535 A.2d 1272, 1275 (1986) (holding that "[p]ublic masturbation is an act which

---

evidence. We are unable to divine any support from our precedential case law—nor has the State provided any—to buttress the State's hyper-formalistic interpretation of Rule 29.

8

may be said to affront the sensibilities of a substantial segment of the community" (quotation omitted)); State v. Purvis, 146 Vt. 441, 443, 505 A.2d 1205, 1207 (1985) (explaining that this Court has declined to define lewd and lascivious conduct, "deferring instead to the common sense of the community"). We have in the past approved of jury instructions explaining that "lewd and lascivious behavior means behavior that is sexual in nature, lustful, or indecent, that which offends the common social sense of the community, as well as its sense of decency and morality." Penn, 2003 VT 110, ¶ 12. Conduct meets the statutory requirement of "openness" if it is done in the presence of at least one other witness. Id.

¶ 21. We have previously rejected the suggestion that a touching cannot amount to lewd and lascivious behavior if it does not involve specific body parts. In State v. Squiers, the defendant was convicted under § 2602 for hugging his granddaughter tightly; rubbing her shoulders, ears, and neck; sniffing her hair; and touching her upper leg while making various suggestive statements. 2006 VT 26, ¶¶ 3-5, 179 Vt. 388, 896 A.2d 80. Defendant appealed the conviction, arguing—much as defendant argues today—that his physical acts toward the victim were not lewd "because there was no touching, rubbing, fondling, or kissing of any private, sexual part of the body." Id. ¶¶ 8-9. We ruled that "the statutory meaning of 'lewd act' upon a child" is not "limited to contact with the so-called 'private' or 'sexual' part of the child's body." Id. ¶ 9. We explained that "[i]f the Legislature intended to limit the definition of a lewd act to contact with or between particular body parts, it could have done so, as demonstrated by specific language used in other statutes that prohibit misconduct of a sexual nature." Id. ¶ 9. The ultimate purpose of § 2602, the Court noted, is to protect children from sexual exploitation and any physical contact that would serve that purpose. Id. ¶ 10. And although "evidence that a defendant touched a child's genital area might present a more obvious case," the sexual exploitation of children proscribed by § 2602 is not "limited to contact with any particular body part." Id. The Court concluded that the definition of lewdness in § 2602 "depends on the nature and quality of the contact, judged by

9

community standards of morality and decency in light of all the surrounding circumstances, accompanied by the requisite, specific lewd intent on the part of the defendant." Id. ¶ 11.

¶ 22.    Applying these standards, we disagree with defendant that the unwanted and public grabbing of a victim's buttocks cannot, as a matter of law, amount to lewd and lascivious conduct. In many instances, we can safely say that the touching of another's buttocks cannot be criminally lewd and lascivious: members of an athletic team encouraging or congratulating one another or a friend attempting to guide a peer through a crowd, for example.  The personal invasion in this case is clearly distinguishable.  The women touched in this case were strangers to defendant, and he did not have permission to grab their buttocks.  Witnesses described defendant leering, stalking, and eventually touching or grabbing his victims in a private and sexualized area, in front of a crowd. This was within the universe of conduct that a reasonable trier of fact could consider criminally offensive under community standards of decency and morality.

2.  Specific Intent to Arouse, Appeal to, or Gratify Lust, Passions, or Sexual Desires

¶ 23.    Lewd or lascivious conduct with a child requires a specific intent to arouse passions.  Section 2602 states that:

> No person shall willfully and lewdly commit any lewd or lascivious act upon or with the body, or any part or member thereof, of a child under the age of 16 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of such person or of such child.

13 V.S.A. § 2602(a)(1).  In contrast to § 2601, which describes a general intent crime, § 2602 defines a specific intent crime.  See State v. Grenier, 158 Vt. 153, 156, 605 A.2d 853, 855 (1992) (noting that if Legislature intended § 2601 to include specific intent element, as well as general intent, it would have said so as it did in § 2602 when prohibiting lewd or lascivious conduct with a child.)

¶ 24.    We conclude that the circumstantial evidence was sufficient to support's the jury's conclusion that defendant touched G.G. and A.T with the requisite intent.  See § 2602 (explaining

10

that defendant must commit the lewd and lascivious conduct with child "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of such person or of such child"). We have recognized that "[i]ntent is rarely proved by direct evidence; it must be inferred from a person's acts and proved by circumstantial evidence." State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988). To establish whether a defendant acted with lewd intent, the jury should consider all circumstances, "including the charged act, the defendant's concurrent statements, any other acts of lewd conduct admitted or charged in the case, the parties' relationship, and any coercion, bribery, or deceit used by the defendant to obtain the victim's cooperation or avoid detection." State v. Hoch, 2011 VT 4, ¶ 13, 189 Vt. 560, 18 A.3d 562 (mem.). In this case, defendant touched each minor victim's buttocks repeatedly, and also grabbed the buttocks of an adult woman. The evidence showed that defendant stared and smirked at the minor victims, apparently deriving pleasure from his acts. And, as noted above, the buttocks are frequently sexualized in our society. Based on the context and nature of these acts, the jury could reasonably infer that defendant touched the minors with lustful intent. See State v. Miller, 146 Vt. 164, 169, 502 A.2d 832, 835 (1985) (explaining that a conviction can rest on circumstantial evidence if the evidence "is sufficient to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt").

## II. Eyewitness Identifications of Defendant

¶ 25. Applying the established two-part due process test for evaluating eyewitness identifications made under suggestive circumstances, we conclude that the pretrial identifications of defendant by G.G., A.T., and G.T. that occurred during a November 2015 hearing were made under highly suggestive circumstances, but were nonetheless sufficiently reliable that the court did not err in declining to exclude them. For the purpose of clarifying our law concerning eyewitness identifications, we note one change to the list of factors this Court has identified as relevant to the question of reliability.

11

¶ 26. We review the legal conclusions in the lower court's denial of defendant's motion to suppress without deference. State v. Mayo, 2008 VT 2, ¶ 12, 183 Vt. 113, 945 A.2d 846. We defer to the court's factual findings and will overturn the findings "only if taking the evidence in the light most favorable to the prevailing party, and excluding the effect of modifying evidence, there is no reasonable or credible evidence to support them." Id. (quotation omitted).

¶ 27. We use a two-part test to determine whether a suggestive eyewitness identification procedure robs a defendant of due process.[4] First, the court examines whether the circumstances surrounding the identification were "unnecessarily suggestive." State v. Porter, 2014 VT 89, ¶ 20, 197 Vt. 330, 103 A.3d 916. Second, even if suggestive, the identification is still admissible "if certain indicia of reliability outweigh the corrupting effect of the suggestive identification." Id. (quotation omitted); see also Mayo, 2008 VT 2, ¶ 16; State v. Kasper, 137 Vt. 184, 192-93, 404 A.2d 85, 90 (1979). In gauging reliability, we examine the totality of the circumstances, including factors such as the opportunity of the witness to view the perpetrator during the commission of the crime; the witness's degree of attention; accuracy of the witness's prior identification of the defendant; and the span of time between the commission of the crime and the time of the identification. Porter, 2014 VT 89, ¶ 20; Kasper, 137 Vt. at 192-83, 404 A.2d at 90.

¶ 28. We agree with defendant, and the trial court, that at the November 2015 hearing G.G., A.T., and G.T. identified defendant in person for the first time under extremely suggestive

_____

[4] Defendant grounds his challenge in Vermont Rule of Evidence 403, and argues that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. He intimates that because—in his estimation—law enforcement did not arrange the suggestive nature of the pretrial identification, he cannot ground his claim in due process. See Porter, 2014 VT 89, ¶¶ 21-22 (explaining that where law enforcement did not arrange suggestive circumstances in pretrial identification, defendant does not have federal constitutional due process claim). When defendant moved to suppress the witness identifications in the court below, he did so on the basis of both due process and Rule 403. The court analyzed defendant's claim under the two-step due process test set forth more fully below. Although defendant seems to concede on appeal that he does not have a due process claim, his legal analysis rests primarily on the familiar two-part due process test. Considering this confusion, and because the State did arrange the suggestive nature of the pretrial identifications, we analyze the issue in this case primarily as one of due process. However, we reach the same conclusion, for similar reasons, under Rule 403.

circumstances. The identifications occurred at a motion hearing during the pendency of the criminal trial in which defendant was the named defendant. Two of the witnesses had seen a photo of the defendant shortly before the hearing. And the identifications took place in the courtroom, while defendant was seated at defense counsel table wearing a prisoner's uniform and shackles. We would be hard-pressed to find a setting for an initial pretrial identification that is more suggestive.

¶ 29. However, we conclude that notwithstanding the suggestiveness of the circumstances of the identifications, the trial court did not abuse its discretion in concluding that the identifications nonetheless bore sufficient indicia of reliability to support their admission. The trial court found that the witnesses provided descriptions of defendant at the hearing that matched their descriptions of him soon after the incidents, and further matched photographs of defendant taken in Burlington's Battery Park and the Waterfront Park on the day of the incidents. The evidence supports the trial court's conclusion on this point. The witnesses' descriptions of him following the incident matched defendant's quite distinctive appearance on that day—including that he was wearing long pants, a long sleeved greyish flannel shirt, and no shoes; that he was "very tall"; that he was carrying a plastic water bottle; and that he had long hair and a beard or facial hair along his chin—all characteristics apparent in the photographs taken of defendant that day. The trial court correctly concluded that these initial descriptions were not offered under suggestive circumstances and included information that could not be readily gleaned from pictures of defendant viewed after the event or from seeing him seated in the courtroom during the hearing.

¶ 30. We note, however, that we here formally abandon one factor—witness certainty—that we have previously identified as relevant to the reliability determination under the two-part test set forth above. With Kasper in 1979, 137 Vt. at 192-93, 404 A.2d at 90, this Court adopted the two-part due process witness identification test articulated by the U.S. Supreme Court in Manson v. Brathwaite, 432 U.S. 98 (1977). When we adopted this test, we also included witness

13

certainty as a factor a court may use in analyzing the reliability of an identification made under suggestive circumstances. See Porter, 2014 VT 89, ¶ 20; Kasper, 137 Vt. at 192-93, 404 A.2d at 90.

¶ 31. In the forty years since Manson, however, scientific evidence concerning the fallibility of eyewitness identification, and specifically the effect of suggestive circumstances on the degree of certainty the witness expresses in an identification, has made various courts and the legal community re-think witness certainty as an admissible factor in determining identification reliability. See Krist v. Eli Lilly and Co., 897 F.2d 293, 297 (7th Cir. 1990) (noting that "the mere fact that we remember something with great confidence is not a powerful warrant for thinking it true"); Brodes v. State, 614 S.E.2d 766, 770 (Ga. 2005) ("[T]he idea that a witness's certainty in his or her identification of a person as a perpetrator reflect[s] the witness's accuracy has been 'flatly contradicted by well-respected and essentially unchallenged empirical studies.' " (quoting State v. Long, 721 P.2d 483, 491 (Utah 1986))); N. A. Kahn-Fogel, Manson and its Progeny: An Empirical Analysis of American Eyewitness Law, 3 Ala. C.R. & C.L. L. Rev. 175, 188-89 (2012) (explaining that "[p]ossibly the most troubling discovery" from post-Manson scientific research "is that the use of suggestive identification procedures artificially inflates witnesses' certainty in their identification and artificially enhances their memories of the degree of attention they paid to perpetrators at the time of a crime and of their opportunities to view perpetrators during crimes"); B. L. Garrett, Eyewitnesses and Exclusion, 65 Vand. L. Rev. 451, 469 (2012) ("A series of studies has shown that jurors rely strongly on the confidence of the eyewitness. Yet, confidence is not highly correlated with accuracy."). At least two states, Kansas and Utah, have completely dropped witness certainty as a reliability factor. See State v. Hunt, 69 P.3d 571, 575-76 (Kan. 2003); State v. Ramirez, 817 P.2d 774, 781 (Utah 1991).[5] We join these states and overrule our past case law

---

[5] At least two other states, Massachusetts and New York, suppress all witness identifications made under suggestive circumstances as a per se rule. See Commonwealth v.

insofar as it includes witness certainty as a factor in assessing the reliability of a witness identification made in suggestive circumstances.[6]

### III.  State's Closing Argument

¶ 32.   We strongly disapprove of the State's inappropriate remarks in closing argument, but conclude that they did not amount to plain error.  During closing argument rebuttal, the prosecutor remarked to the jury:

> It's sad that the defense argues that this behavior isn't lewd and lascivious.  No woman or girl should have to withstand a stranger touching her buttocks.  But here, it's even more egregious.  It's egregious because of the intent, the planning, the visual stalking, and the stare afterward that defendant cast upon the two teenage girls.
>
> Send a message to these young girls and the woman in Battery Park that what happened to them is a violation of the law and will not be tolerated.  Send a message to the defendant that his behavior is criminal and will not be tolerated.  And send a message to this community that we will not tolerate lewd and lascivious conduct. Thank you.

Defendant did not object.

¶ 33.   After the closing arguments, the court gave its jury instruction, in which it warned the jury that counsel's arguments were not evidence; their duty was to analyze the evidence and only the evidence presented in the case when deliberating; defendant was presumed innocent and that it was the State's burden to prove him guilty beyond a reasonable doubt; they should not to be influenced by sympathy or prejudice to the State, defendant, or any other person involved in the

---

Johnson, 650 N.E.2d 1257, 1264-65 (Mass. 1995); People v. Adams, 423 N.E.2d 379, 383-84 (N.Y. 1981).

[6] We acknowledge that the trial court identified each of the witnesses' certainty as a factor supporting the trial court's reliability determination, and that the logical consequence of our abandonment of that factor as relevant might therefore be to remand for a new determination of the suppression motion without consideration of that factor.  However, on the record of this case, the alignment between the witnesses' uncoached descriptions of defendant shortly following the incidents at the marathon with each others' descriptions and the photographs undisputedly taken of him at the marathon, coupled with his distinctive and out-of-place appearance in that context, leave no room to doubt that the witnesses in this case properly identified defendant.

case; not to worry about what happens after they reach their verdict; and to think objectively and impartially to apply the law as the court had explained it in its instruction.

¶ 34. For the reasons set forth below, we reject defendant's claim that the State's "inflammatory" argument "that appealed to the sympathy of the jury about what is fair and not fair, and messages that should be sent" were "unfairly prejudicial" and affected "the jury's deliberation . . . striking at the very heart of [defendant's] constitutional rights."

¶ 35. Our longstanding rule is that trial counsel should limit closing arguments to the evidence in the case and the inferences properly drawn therefrom. State v. Scales, 2017 VT 6, ¶ 29, __ Vt. __, 164 A.3d 652. "Every respondent, no matter how clear the evidence may make his guilt, is entitled to a fair trial and to receive a verdict after an argument based only upon that evidence, without an inflammatory appeal or the reference to matters outside the record." State v. Parker, 104 Vt. 494, 503, 162 A. 696, 700 (1932); see also State v. Webster, 2017 VT 98, ¶ 26, __ Vt. __, __ A.3d __ ("A prosecutor's comments should not be inflammatory, should be confined to the evidence and the reasonable inferences drawn from them, and should not inject the prosecutor's personal opinion as to a defendant's guilt.").

¶ 36. Defendant concedes that he did not object or seek a curative instruction to the State's closing remarks; accordingly, we review the remarks for plain error only. V.R.Cr.P. 52(b). Closing remarks constitute plain error if "they are so manifestly and egregiously improper that there is no room to doubt the prejudicial effect." State v. Kelley, 2016 VT 58, ¶ 48, 202 Vt. 174, 148 A.3d 191; see also State v. Ladue, 2017 VT 20, ¶ 39, __ Vt. __, 168 A.3d 430; State v. Hemond, 2005 VT 12, ¶ 14, 178 Vt. 470, 868 A.2d 734 (mem.). Plain error occurs in the extraordinary case "where a glaring error occurred during the trial and was so grave and serious that it strikes at the very heart of the defendant's constitutional rights." State v. Riva, 145 Vt. 15, 19, 481 A.2d 1060, 1063 (1984) (quotation omitted).

¶ 37. We conclude that the State's comments that defendant's position was "sad" and "egregious" did not rise to the level of plain error. We generally disapprove of closing remarks that impugn the defense. Scales, 2017 VT 6, ¶ 24. But the remark here was isolated, came at the end of the State's long closing remarks that stuck to the evidence of the case, and came before the court's jury instruction, which warned the jury to objectively analyze the evidence in the case and to apply that evidence to the law as described by the court. See supra, ¶ 36; Webster, 2017 VT 98, ¶ 33 (explaining that prejudicial comment in closing remark was not plain error because comment was isolated and jury was instructed that attorney comments were not evidence and that verdict should be based only on evidence). These comments were improper, but not so "manifestly and egregiously improper" as to warrant a new trial.

¶ 38. Nor are we convinced that the State's comments that the jury should convict to "send a message" amount to plain error. Much like closing remarks that impugn the defense, asking the jury to "send a message" in a criminal case is impermissible. Send-a-message comments may very easily confuse the jury as to their role and lead to a conviction based on something other than the evidence and the law. State v. Hawk, 743 A.2d 325, 331 (N.J. Super. Ct. App. Div. 2000); see also Campbell v. State, 679 So. 2d 720, 724 (Fla. 1996) (" 'Message to the community' arguments are impermissible—they are an obvious appeal to the emotions and fears of the jurors. These considerations are outside the scope of the jury's deliberation and their injection violates the prosecutor's duty to seek justice . . . . " (quotation and citations omitted)); State v. Woodard, 2013 ME 36, ¶ 34, 68 A.3d 1250 ("Within our constitutional framework, it is not the role of a jury to . . . send messages about matters of public concern, even though that may be the effect of a verdict in some instances."). It was not this jury's responsibility to "send a message" to the complainants, defendant, or the community about what behavior is tolerable. In fact, convicting defendant in order to do so would have strayed from the jury's assigned and

17

appropriate role. We condemn as improper the State's encouragement to the jury to "send a message."

¶ 39. However, the unobjected-to comment was not plain error, as it was quick, relatively isolated, and came before the court's jury instruction noted above. See People v. Gallegos, 260 P.3d 15, 28 (Colo. Ct. App. 2010) (concluding that "send a message to community" comment was "not flagrantly improper so as to constitute plain error" where defense counsel failed to object to comment during trial and statement was small part of closing argument); People v. Desantiago, 850 N.E.2d 866, 875 (Ill. Ct. App. 2006) (holding that State's send-a-message comment did not rise to plain error); Woodard, 2013 ME 36, ¶ 36 (explaining that State's send-a-message comment was not plain error because State presented a strong case against defendants, "the prosecutor's appeal to the jury to send a message was mentioned only briefly and was not a focus of the prosecutor's closing argument," and "the court instructed the jurors . . . that they were not to consider the attorney's arguments as evidence"); State v. Pourrier, No. A14-0568, 2015 WL 853437, at *7 (Minn. Ct. App. Mar. 2, 2015) (holding that State's send-a-message plea did not constitute plain error because defense counsel did not object or seek curative instruction and comment made up only small portion of closing argument); State v. Pendas, 855 S.W.2d 512, 516 (Mo. Ct. App. 1993) (holding that state's send-a-message comment was not plain error because it "fell far short of having a decisive effect on the jury").

¶ 40. For the above reasons, we affirm.

Affirmed.

FOR THE COURT:

_____
Associate Justice